**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 04-607** |
| **SEAN MURRAY** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

## I. DEFENDANT'S HISTORY

The defendant, Sean Murray, who is 38 years old, has led a completely dissolute life, abandoned completely to the commission of crime as a means of supporting himself and his predatory lifestyle. He pled guilty before this Court to possessing 163 grams of cocaine with the intent to distribute, while he was on supervised release under a sentence for racketeering administered by Judge Dalzell. He faces sentencing by Judge Dalzell after this Court has finished with him.

At age 16 he was adjudicated delinquent, as a minor, for robbery, aggravated assault and terroristic threats. At age 17 he was adjudicated delinquent for attempted burglary, simple assault and conspiracy. Court records reflect a bench warrant was issued in this case for the defendant's failure to appear, which was later excused, when he appeared at the disposition of the matter, on the representation that defendant was in the Marine Corps. Defendant has never thereafter acknowledged to his various probation officers, including his federal probation officers, that he was in the Marine Corps, although his pay records indicate he received about

$331.25 in pay from the Marines in 1986.

At age 25 he stole a watch at a Strawbridge & Clothier's store. When he was arrested, he had a .38 pistol and 36 vials of crack in his pocket. He pled guilty to possession of the crack and of the illegal possession of the firearm, and received a term of probation. At the time of his arrest he was using a fake name, Social Security number and address. He failed to appear during the course of this proceeding and the court issued a bench warrant for his arrest.

At age 31 he pled guilty to a racketeering charge and was sentenced to 30 months imprisonment. The racketeering organization operated a large scale counterfeit check ring. The defendant personally caused the negotiation of 78 counterfeit checks, and was responsible for $251,777.33 in losses. The entire organization cost financial institutions over $6,000,000. While in federal custody he was diagnosed with bipolar disorder. He was prescribed medication to control the disorder, but medical staff indicates he has been less than religious about taking his medication.

While on federal supervised release, the defendant opened a line of credit without the approval of the Probation Office, using a Social Security number not his own. On May 19, 2004 he was arrested in the current matter.

In addition to the three arrests that resulted in adjudications of delinquency or conviction, the defendant has been arrested without conviction on six occasions between 1986 and 1997: at age 19 for theft of an automobile; at age 20 for robbery; at age 21 for robbery, aggravated assault and carrying a gun; at age 21 for murder, aggravated assault and carrying a firearm; at age 22 for carrying a firearm; at age 29 for robbery and carjacking. The defendant used various aliases during these episodes.

The defendant's personal life is notable for the fact that he has fathered three children by three women, Constance Roux (age 45), Rhonda Coleman (33), and Nikki Banks (28). His children are aged 10, 7 and 3. At the time of his arrest in this case he was co-habiting with a 17 year old woman named Jessica Soto.

The Social Security Administration reports no earnings for the defendant since 1986. He reports that since then he has dabbled occasionally in non-criminal employment, but has managed to keep this employment "under the table," and therefore largely unverifiable. Whatever the defendant has stolen through his criminal activity, and whatever wages he has earned through "legitimate" employment, have remained entirely devoted to the pursuit of his own desires, while the taxpaying citizens of the Commonwealth of Pennsylvania and the United States have continued to support the defendant and his spawn.

As the PSR details, the defendant has lied repeatedly during the course of his regular encounters with law enforcement about his identity and his true residence.

## II. THE CHARGES AND PENALTIES

Defendant pled guilty to the possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841. The charge stems from an arrest of defendant which occurred on May 19, 2004 in Philadelphia. Under 21 U.S.C. § 841(c), the defendant faces a maximum sentence of 20 years imprisonment, a $1,000,000 fine, a minimum of 3 years up to a lifetime of supervised release, a $100 special assessment, and forfeitures.

The Presentence Investigation Report (PSR) properly attributed 163 grams of cocaine to the defendant and calculated his adjusted offense level as 18. The defendant timely accepted responsibility for his conduct and the PSR recommended a reduction in offense level by

three to reflect that fact. The defendant's total offense level, under the Sentencing Guidelines, is therefore 15.

The defendant has two convictions that result in criminal history points, his racketeering conviction (three points) and his drug conviction (one point). He should receive two additional points for committing the offense while on supervised release, and one additional point for being arrested less than two years after his release from custody. His total of seven criminal history points translates into a criminal history category of IV. His offense level of 15 and criminal history category of IV result in a Sentencing Guidelines imprisonment range of 24 to 30 months.

## III. SENTENCING CONSIDERATIONS AND RECOMMENDATION

Pursuant to United States v. Cooper, 437 F.3d 324, 330 (3d Cir. 2006), this Court must calculate the advisory guideline range, and then consider that range along with all the pertinent considerations of sentencing outlined in 18 U.S.C. § 3553(a) in determining the final sentence. Pursuant to United States v. Grier, 2006 WL 1530009 (3d Cir. June 6, 2006), the Court must explain on the record its consideration of all of these pertinent factors and the reasons for its final sentence. See id. at *12 (holding that the solitary statement, "The Court believes that 100 months is reasonable in view of the considerations of section 3553(a)," was insufficient to explain the district court's reasoning, and remanding for resentencing).

In imposing sentence, the Court must take into account the considerations of sentencing set forth in 18 U.S.C. § 3553(a). United States v. Booker, 543 U.S. 220, 261 (2005). First, as stated in Section 3553(a)(4), the Court must determine and consider the sentencing range established in the Sentencing Guidelines. The Third Circuit has confirmed: "In consideration of

the § 3553(a) factors, a trial court must calculate the correct guidelines range applicable to a defendant's particular circumstances." Cooper, 437 F.3d at 330. This Court must make findings pertinent to the guideline calculation by applying the preponderance of the evidence standard, in the same fashion as was employed prior to the Booker decision. Id.; Grier, 2006 WL 1530009, at *3-9.

Once the Court has properly calculated the guideline range, the Court must next consider all of the sentencing considerations set forth in Section 3553(a).

A full review of all pertinent factors supports the conclusion that a within-guideline sentence is appropriate in this case.

A Importance of the Guideline Range.

The advisory guideline range carries considerable weight even after Booker. As the Third Circuit stated, "a within-guidelines range sentence is more likely to be reasonable than one that lies outside the advisory guidelines range . . . ." Cooper, 437 F.3d at 331. The importance of the final guideline range has nothing to do with the guidelines' former mandatory status, which was eliminated in Booker. Rather, the final guideline range is the starting point for determining reasonableness for three reasons: (1) only the guidelines comprehensively examine the full panoply of sentencing considerations; (2) the guidelines represent decades of nationwide experience and study; and (3) they are the only measure for avoiding unwarranted sentencing disparities. Congress explicitly created the Sentencing Commission and the guideline system to achieve these ends.

First, the guidelines are much more comprehensive than any other Section 3553(a) factor. Each of the other 3553(a) factors addresses only a single facet of the many issues posed

by sentencing. "[T]he factors the sentencing commission was required to use in developing the Guidelines are a virtual mirror image of the factors sentencing courts are required to consider under Booker and § 3553(a)." United States v. Shelton, 400 F.3d 1325, 1332 n.9 (11th Cir. 2005); Statement of Judge Ricardo H. Hinojosa, Chair of the United States Sentencing Commission, quoted in United States v. Peach, 356 F. Supp. 2d 1018, 1020-22 (D.N.D. 2005). In formulating the guidelines, the Commission was required to and has considered all of the Section 3553(a) factors. See 28 U.S.C. §§ 991(b)(1), 994(b)(1), (c), (f), (g), (m); U.S.S.G. § 1A1.1 Editorial Note.

Second, the guidelines are the product of years of nationwide experience and sustained study. In drafting the original guidelines (which became effective with respect to offenses committed on or after November 1, 1987), the Sentencing Commission canvassed prior sentencing practice, identifying aggravating and mitigating factors. 28 U.S.C. § 994(m); U.S. Sentencing Commission, Supplementary Report on the Initial Sentencing Guidelines and Policy Statements 16-17 (1987). Since then, the Commission has continued to study district court and appellate sentencing decisions, and has fine-tuned the guidelines to take them into account. U.S.S.G. App. C. Indeed, the Booker Court specifically affirmed that the Commission will continue to study appellate and district court sentencing decisions, and "will continue to modify its Guidelines in light of what it learns, thereby encouraging what it finds to be better sentencing practices." Booker, 543 U.S. at 263 (Breyer, J.).

The Sentencing Commission's incomparable flow of nationwide information, and its years of concentrated study on this topic, merit strong consideration by judges who are assigned the task of determining appropriate sentences for criminal conduct. United States v.

Wilson, 350 F. Supp. 2d 910, 914-25, reaffirmed on denial of reconsideration, 355 F. Supp. 2d 1269, 1271-88 (D. Utah 2005); United States v. Wanning, 354 F. Supp. 2d 1056, 1060-62 (D. Neb. 2005); Peach, 356 F. Supp. 2d at 1020-22.

Third, the correctly calculated guideline range is the only means to evaluate the statutory sentencing goal on which Booker placed so much emphasis: "the need to avoid unwarranted sentence disparities," 18 U.S.C. § 3553(a)(6).[1] Congress, the Court, and the guidelines all seek to minimize such disparity compared to "all other similar sentences imposed nationwide." United States v. White, 406 F.3d 827, 837 (7th Cir. 2005). The Sentencing Guidelines provide the comprehensive information and guidance about sentencing around the nation that is essential to accomplishing Congress' goal of uniform federal sentencing. "The only way of avoiding gross disparities in sentencing from judge-to-judge and district-to-district is for sentencing courts to apply some uniform measure in all cases. The only standard currently available is the Sentencing Guidelines." Wilson, 350 F. Supp. 2d at 924; Wanning, 354 F. Supp. 2d at 1061-62 ("we have no meaningful substitute for the neutrality, coherence, and equality" that the guidelines provide). Thus, measuring reasonableness in relation to the guideline range serves "to minimize the wide disparity in sentencing across the country for similarly situated

[1] Every opinion in Booker acknowledged the express national policy, as articulated by Congress, that sentences be uniform across the country to the extent possible. See, e.g., Booker, 543 U.S. at 253 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); id. at 744 (same) ("Congress' basic statutory goal of diminishing sentencing disparity depends for its success upon judicial efforts to determine, and to base punishment upon, the real conduct that underlies the crime of conviction."); id. at 292 (dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim."); id. at 303-04 (dissenting opinion of Scalia, J.) ("the primary objective of the Act was to reduce sentencing disparity.").

defendants that led to the enactment of the Guidelines in the first place." United States v. Paulus, 331 F. Supp. 2d 727, 733 (E.D. Wis. 2005).

Thus, the Third Circuit in Cooper stated that "'[t]he Guidelines remain an essential tool in creating a fair and uniform sentencing regime across the country,' and provide a natural starting point for the determination of the appropriate level of punishment for criminal conduct." Cooper, 437 F.3d at 331, quoting United States v. Mykytiuk, 415 F.3d 606, 608 (7th Cir. 2005).[2]

Accordingly, while no appellate court in the time since Booker was decided has found a within-guideline sentence to be unreasonable, many appellate courts have reversed as unreasonable sentences imposed outside the applicable guideline ranges.[3] Moreover, the Courts of Appeals have emphasized that the further outside the range, either above or below, a sentence falls, the stronger must be the justification for such disparate sentencing.[4]

---

[2] In aiming for uniform sentencing, the appropriate focus is on sentences imposed in federal court for like offenses. A panel of the Third Circuit correctly found "no merit in [the] argument that the District Court should have considered what [the defendant]'s sentence would have been had he been convicted of a similar state-law offense. Booker directs our reasonableness review to the factors set forth under federal law for federal criminal offenses. That a separate sovereign chooses to implement its criminal sentencing scheme in a different manner does not impact our analysis under § 3553(a)(6), which focuses on the need to avoid unwarranted disparities among sentences issued by federal courts for violations of federal law." United States v. Cropper, 2006 WL 372338, at *4 n.7 (3d Cir. Feb. 17, 2006) (not precedential).

[3] See, e..g, United States v. Zapete-Garcia, 447 F.3d 57 (1st Cir. 2006); United States v. Smith, 445 F.3d 1 (1st Cir. 2006); United States v. Davenport, 445 F.3d 366 (4th Cir. 2006); United States v. Hampton, 441 F.3d 284 (4th Cir. 2006); United States v. Moreland, 437 F.3d 424, 434-37 (4th Cir. 2006); United States v. Duhon, 440 F.3d 711 (5th Cir. 2006); United States v. Goody, 442 F.3d 1132 (8th Cir. 2006); United States v. Lazenby, 439 F.3d 928, 933 (8th Cir. 2006); United States v. McVay, 2006 WL 1193212, at *9 (11th Cir. May 5, 2006).

[4] "[T]he farther the judge's sentence departs from the guidelines sentence . . . the more compelling the justification based on factors in section 3553(a) that the judge must offer in order

B. Application of the § 3553(a) Factors.

In this case, no unusual circumstances exist which warrant an exception to the preference for guideline sentencing. Section 3553(a)(4) and (5) specifically direct the Court to consider the applicable guidelines, and Section 3553(a)(6) commands that the Court strive to avoid disparity in sentencing, which, as explained above, is best accomplished through faithful application of the guidelines. The other 3553(a) factors also point to this conclusion. While the defendant's history and offense conduct, discussed in detail below, obviously support a guideline sentence when taken as a whole, the impact of each of the 3553(a) factors is summarized briefly below:

*(1) the nature and circumstances of the offense and the history and characteristics of the defendant:*

In this case, the defendant, age 38, possessed 163 grams of cocaine while on supervised release, after leading a full and complete life of crime.

*(2) the need for the sentence imposed--*

*(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;*

The offense was grave, and only the most severe punishment will impress upon the defendant, a recidivist by vocation, any kind of respect for the law.

---

to enable the court of appeals to assess the reasonableness of the sentence imposed." United States v. Dean, 414 F.3d 725, 729 (7th Cir. 2005). Accord United States v. Smith, 445 F.3d 1, 4 (1st Cir. 2006); United States v. Gatewood, 438 F.3d 894, 896 (8th Cir. 2006); United States v. Moreland, 437 F.3d 424, 434 (4th Cir. 2006).

*(B) to afford adequate deterrence to criminal conduct;*

At this juncture in the defendant's perfectly reckless career, only the most severe punishment can have any hope at deterring future criminal conduct.

*(C) to protect the public from further crimes of the defendant; and*

The defendant's recidivism, conduct while under terms of release and career choice as a criminal make it clear that even individual deterrence is at best a "long-shot." Society has no other means to protect itself from this defendant but by incarcerating him for as long as it can.

*(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;*

The defendant is likely to take his medication while in federal prison; he is unlikely to take it regularly while on his own, since he has systematically violated every wisp of structure and order that has struggled to make itself felt in his life.

*(3) the kinds of sentences available;*

Incarceration in a federal prison is the only type of sentence that suggests itself. Rewarding the defendant with probation, a half-way house, or other alternatives would be repugnant and disastrous, based on the defendant's history and offense conduct.

*(4) the kinds of sentence and the sentencing range established for--*

*(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . issued by the Sentencing Commission .*

*. . that . . . is in effect on the date the defendant is sentenced; . . .*

The Sentencing Guidelines carefully weigh the various factors applicable to sentencing in arriving at a recommendation of 24-30 months. They should be followed.

*(5) any pertinent policy statement . . . issued by the Sentencing Commission . . . that . . . is in effect on the date the defendant is sentenced.*

The Sentencing Commission established guideline imprisonment ranges by "estimating the average sentences now being served within each category." U.S.S.G. §1A1.1(4)(g). It departed from the data on existing sentences only "for various important reasons . . ." U.S.S.G. §1A1.1(3). The purposes of the Sentencing Reform Act of 1984 are "deterrence, incapacitation, just punishment, and rehabilitation." U.S.S.G. §1A1.1(2). In achieving its goals, Congress sought honesty, uniformity and proportionality in sentencing. U.S.S.G. §1A1.1(3). In this case, as in most cases, the various important purposes of sentencing can best be reconciled by following the Sentencing Guidelines recommended imprisonment range.

*(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and*

In this case, as in virtually all cases, this statutory purpose can best be served by following the Sentencing Guidelines.

*(7) the need to provide restitution to any victims of the offense.*

Restitution is not an issue in this case.

The government recommends a "within guidelines" sentence of 30 months imprisonment, followed by a lengthy period of supervised release, in light of the defendant's age, lifetime of criminal activity, social irresponsibility and behavior while on release.

## IV. CONCLUSION

The government requests that the Court make the finding required under Cooper and Grier, and impose a sentence of 30 months imprisonment and a substantial period of supervised release to follow.

Respectfully submitted,

PATRICK L. MEEHAN
United States Attorney

____________________________
RICHARD A. LLORET
Assistant United States Attorney

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing was sent via regular mail to:

Jack McMahon
1500 Walnut Street
Suite 900
Philadelphia, PA 19102
Fax: (215) 985-4416
Counsel for Defendant, Sean Murray

______________________________
RICHARD A. LLORET

DATE: July 5, 2006